AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
_____ District of _____

**FILED**
August 08, 2025
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: _____aq_____
DEPUTY

United States of America )
v. )
)  Case No.
)
)
)
Taylor A. Lee )
*Defendant(s)*

## SECOND AMENDED CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ in the county of _____ in the _____ District of _____, the defendant(s) violated:

*Code Section*                    *Offense Description*

This criminal complaint is based on these facts:

☐ Continued on the attached sheet.

Complaint sworn to telephonically on
August 08, 2025 at 01:02 PM and signed
electronically. **FED.R.CRIM.P. 4.1(b)(2)(A)**

☐ Sworn to before me and signed in my presence.
☐ Sworn to telephonically and signed electronically.

Date: _____

City and state: _____

*Complainant's signature*

*Printed name and title*

*Judge's signature*

*Printed name and title*

AFFIDAVIT IN SUPPORT OF AN APPLICATION
FOR A CRIMINAL COMPLAINT AND ARREST WARRANT

I, Nicholas A. Napoli, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I seek a criminal complaint charging TAYLOR A. LEE ("LEE") with attempting to transmit national defense information to a foreign adversary, in violation of the Espionage Act, Title 18, U.S. Code, Section 794(a), and with attempting to export, without a license, export-controlled defense articles and technical data, in violation of the Arms Export Control Act, Title 22, U.S. Code, Section 2778(b), and the International Traffic in Arms Regulations, 22 C.F.R. §§ 127.1(a)(1), 127.1(a)(5).

2. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been in this role since 2019. During this time, I have received training at the FBI Academy located in Quantico, Virginia, to include training on investigative methods and training specific to counterintelligence investigations. I am currently assigned to a squad at the FBI Washington Field Office, Counterintelligence Division, where I primarily investigate counterintelligence, espionage, and unauthorized disclosures of classified information. During my FBI employment, I have conducted or participated in witness and subject interviews, service of subpoenas, the execution of search and arrest warrants, physical surveillance, the seizure of evidence, including computer, electronic, and email evidence, as well as requested and reviewed pertinent records. Based on my experience and training, I am familiar with the requirements for the handling of classified documents and information. I am also familiar with the methods used by individuals engaged in unlawful use or disclosure of classified information, including national defense information.

3. The facts in this affidavit are based on my personal observations, my training and experience, and information obtained from other agents, U.S. Government personnel, and

witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Where I have reported statements made by others, or from documents that I have reviewed, those statements are summarized, unless otherwise noted.

4. Based on my training and experience, and the facts set forth in this affidavit, there is probable cause to believe that LEE has violated the Espionage Act, Title 18, U.S. Code, Section 794(a), as well as the Arms Export Control Act, Title 22, U.S. Code, Section 2778(b) and related regulations.

## STATUTORY AUTHORITY AND DEFINITIONS

### *The Espionage Act*

5. Pursuant to Title 18, U.S. Code, Section 794(a), "Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to communicate, deliver, or transmit, to any foreign government . . . or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly . . . any document, writing, . . . note, instrument, appliance, or information relating to the national defense, shall be punished by death or by imprisonment for any term of years or for life . . . ."

### *Arms Export Control Act and the International Traffic in Arms Regulations*

6. In furtherance of the national security and foreign policy interests of the United States, the export of defense-related articles is regulated by the Arms Export Control Act, Title 22, U.S. Code, Section 2778 ("AECA"). Section 2778(a) authorizes the President of the United States to control the export of defense articles and to establish a United States Munitions List ("USML"), which identified and defined the defense articles subject to those controls. Section 2778(b) provided that any person engaged in the business of manufacturing or exporting any defense article

shall register with the government. Section 2778(c) established criminal penalties for any willful violation of Section 2778 or any rule or regulation promulgated thereunder.

7. The United States Department of State, through the Directorate of Defense Trade Controls ("DDTC"), implemented these statutory provisions by adopting the International Traffic in Arms Regulations ("ITAR"), Title 22, Code of Federal Regulations, Parts 120 et seq. These regulations established the USML and required an export license for the export of any items on the USML. "Defense articles," as that term is used in Title 22, U.S. Code, Section 2778(b)(2) and the ITAR, means items, including "technical data," designated for placement on the USML as weapons, weapons systems, aircraft, surface vessels of war, associated equipment, and other implements of war.

8. For purposes of the AECA and ITAR, the term "export" includes "[r]eleasing or otherwise transferring technical data to a foreign person in the United States." 22 C.F.R. § 120.50(a)(2). Such transfers are known as "deemed exports." Additionally, as relevant here and pursuant to 22 C.F.R. § 120.33, "technical data" is defined to include information "which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles."

9. With limited exceptions, a person or entity seeking to export from the United States designated defense articles, including technical data, must receive a license or other approval from the DDTC.

10. As discussed in greater detail below, at no time did LEE obtain a license from the DDTC.

## PROBABLE CAUSE

### *Background on LEE*

11.     Taylor Adam LEE is a 22-year-old resident of El Paso, Texas, which is in the Western District of Texas. LEE is an active duty servicemember in the U.S. Army and is stationed at Fort Bliss. LEE is an E-4, Specialist, with a military occupational specialty of 19K, M1 Armor Crewman. LEE currently serves as an Assistant Tank Commander.

12.     LEE enlisted in the U.S. Army on or about March 26, 2021. After joining the U.S. Army, LEE reported to Fort Benning, Georgia for Basic Training and Advanced Individual Training on or about May 4, 2021. LEE then reported to the First Armored Division stationed at Fort Bliss on or about December 11, 2021. LEE reenlisted in the United States Army on or about October 27, 2023.

13.     While in the U.S. Army, LEE was accepted into the United States Army Explosive Ordnance Disposal (EOD) training school to become an EOD specialist. This training requires a Top Secret (TS) / Sensitive Compartmented Information (SCI) clearance.[1] LEE was granted a TS/SCI security clearance on or about January 23, 2024. On or about May 27, 2024, LEE reported to the U.S. Army EOD training but ultimately was dismissed due to LEE's failure to fulfill course requirements and LEE's generally unsatisfactory performance. LEE departed EOD training school on or about May 29, 2024. LEE returned to Fort Bliss on or about September 10, 2024. LEE is currently assigned to Bravo Company, 4th Battalion, 70th Armor Regiment, 1st Armored Division.

---

[1] "Top Secret" information is defined as information that, if disclosed, "reasonably could be expected to cause exceptionally grave damage to the national security . . . ." Executive Order 13526 at Sec. 1.2(a)(1). Sensitive Compartmented Information ("SCI") means classified information concerning or derived from intelligence sources, methods, or analytical processes, which is required to be handled within formal access control systems.

14.    On or about July 7, 2022, LEE executed an agreement entitled, "Classified Information Nondisclosure Agreement."  By entering this Agreement with the United States, LEE "acknowledge[d] that [he had] received a security indoctrination concerning the nature and protection of classified information."  Additionally, as part of the Agreement, LEE agreed that he had "been advised that the unauthorized disclosure, unauthorized retention, or negligent handling of classified information . . . could cause damage or irreparable injury to the United States."  Finally, by signing the Agreement, LEE acknowledged that he had "been advised that any unauthorized disclosure of classified information . . . may constitute a violation, or violations, of United States criminal laws," including specification Title 18, U.S. Code, Sections 641, 793, and 794.

### *LEE Contacts the Russian Embassy and the FBI Initiates an Investigation and Operation*

15.    Beginning in or around October 2024, LEE was the subject of an unrelated criminal investigation.  Legal process issued to a telecommunications provider revealed that on three separate occasions—specifically, on May 15, May 28, and May 29, 2025—LEE placed calls to phone numbers associated with the Russian Embassy in Washington, D.C.

16.    In May 2025, the FBI opened an investigation and commenced an operation intended to better understand the purpose of LEE's outreach to the Russian Embassy.  Beginning on or about May 30, 2025 and continuing through the present, the FBI, through a certified Online

Covert FBI Agent (the "FBI Agent"), communicated with LEE via encrypted messaging applications. The content of those communications is summarized below.

17. On May 30, 2025, approximately two weeks after LEE's initial call to the Russian Embassy, the FBI Agent sent a message to LEE stating, "My colleague give me this email for possible cooperation." The FBI Agent further asked LEE "What is your interest and how do you wish to work together?"

18. The same day, LEE responded, writing "May I ask who you represent first. Then I can continue." LEE signed the message "T.L.," which your Affiant understands to be a reference to LEE's initials.

19. Later, on June 2, 2025, LEE sent a message to the FBI Agent stating that LEE was "Hoping to discuss cooperation if you are available." After the FBI Agent requested further information about the nature of LEE's cooperation, LEE wrote that he "could provide armored operations information," "first hand knowledge," and "operator experience on the M1 Abrams platform." LEE then added that he also wanted to share "something I can discuss more securely." In exchange, LEE stated that he "just hope[d] for safe travel to the country," adding that he would "need support to get their [sic]."

> I can provide armored operations information, first hand knowledge, and operator experience on the M1 Abrams platform, as well as something I can discuss more securely. I just hope for safe travel to the country, and I'd need support to get their.
>
> T.L.
>
> Sent from Proton Mail Android

20. In response to LEE's messages, the FBI Agent wrote, "I work for my country Services," explaining, "I help those who wish to cooperate with my country."

6

### *LEE Offers to Send Defense Information to Russia's Ministry of Defense and Establishes His U.S. Army Credentials*

21. In the days that followed, LEE sent three additional messages that received no response. On June 5, 2025, LEE wrote again, stating "I do apologies [sic] for the several messages," explaining that "there is just a matter of urgency with this." LEE then added, "[a]s for my cooperation with your government I am willing to give documents, information on new programs I have witnessed in person, first hand accounts on armored operations, and to show weaknesses." LEE added that he "had tried becoming a whistleblower and [that] my safety is in question now, which is the reason behind the urgency." Later in the same message, LEE stated that he was "willing to work and assist wherever is deemed necessary, or best use." LEE ended the message by reiterating his experience, explaining that he has "experience behind the M1A2 Abrams platform, UAS (unmanned arial [sic] systems), Ordinance disposal, and psychological operations." LEE also emphasized that he had "done tours inside strategic points," that he has "done training with NATO partners (total of 12 countries)," and that he has had the opportunity to "view new platforms the USA is looking to [sic] at developing." LEE then stated that he "wished to set up secure communication to continue this discussion."

22. On June 6, 2025, the FBI Agent asked LEE to switch to a different encrypted messaging application. LEE agreed and communications between LEE and the undercover FBI Agent continued on the new encrypted messaging application. Using this new encrypted messaging application, LEE communicated from an account that displayed the name "Taylor Lee."

7

23. On June 9, 2025, the FBI Agent asked LEE whether he could provide any information to confirm his identity. LEE stated that he could provide a "military website" that showed that LEE holds a "clearance." LEE also stated he would "send one of several classes [of] documents I have stored." LEE then asked for additional details about "what agency [he] was speaking with to ensure I'm not just sending information back to my own government." LEE reiterated his demand for "citizenship, passport, and a safe way to travel to the country." He added that he would "even be willing to continue cooperation there as I can explain weak points in vehicle systems and show training." A screenshot of these messages is shown below.

> I do, I can show a military website showing I hold clearance and send one of several classes documents I have stored. May I ask what agency I may be speaking with to ensure I'm not just sending information back to my own government

> I ask for citizenship, passport, and a safe way to travel to the country. I'd even be willing to continue cooperation there as I can explain weak points in vehicle systems and show training

24. The following day, in response to LEE's request for additional information about "which agency" he was speaking to, the undercover FBI Agent stated that he worked for Russia's Ministry of Defense. The FBI Agent added that "my service appreciates information that benefits our country," including "information that we are unable to obtain ourselves."

25. Later that same day, LEE again raised the "urgency" of this matter. LEE explained that "the u.s. military is doing actions that they were covering up, human trafficking and criminal activities." According to LEE, he "had reported it through our clear channels but someone didn't like it," adding that "other soldiers have gone missing or ended up dead." LEE then reiterated the topics on which he claimed to possess information, including "information behind the main weapons platform I've been behind, future advancements on the next weapon platform, additional tools and equipment coming," among other topics.

26. On June 10, 2025, LEE sent several images that appeared to be screenshots taken of a computer screen. The first image displayed a computer screen featuring a title across the top, which read, "Soldier Talent Profile." The image was redacted with black scribbles, presumably by LEE. These scribbles obscured the name and/or photograph of the soldier. Subsequent images appeared to be zoomed-in screenshots of different parts of the same Soldier Talent Profile. One such image appeared to show a particular soldier's assignments, with the most recent assignment being "GUNNER / ASSISTANT TANK COMMANDER." A second zoomed-in screenshot showed that this particular soldier holds a TOP SECRET / SENSITIVE COMPARTMENTED INFORMATION security clearance.

27. During the course of this investigation, your Affiant has obtained an unredacted copy of LEE's Soldier Talent Profile. A comparison of the redacted image sent by LEE and the unredacted profile confirm they are the same page.

### *LEE Transmits Export-Controlled Technical Information on the M1A2 Abrams Tank to the Undercover FBI Agent and Offers Assistance to the Russian Federation*

28. On June 11, 2025, LEE sent a message to the FBI Agent stating that he could "supply 3 more files until I can hand off a flash drive," adding, "In person I can discuss the new programs happening . . . ." LEE then transmitted several official U.S. Army documents. Your Affiant has reviewed these documents and verified that they are in fact internal U.S. Army documents relating to military equipment and platforms.

29. On June 12, 2025, LEE wrote that he could provide additional information, but that he was "curious about working on a deal with your nation. Is that possible?" On June 14, 2025, LEE then transmitted four additional documents, all of which were technical and/or operations

manuals for the M1A2 Abrams tank. Two of these documents featured the following warning on the front cover of the manual:

> **WARNING**: This document contains technical data whose export is restricted by the Arms Export Control Act (Section 2751 of Title 22, United States Code) or the Export Control Reform Act of 2018 (Chapter 58 Sections 4801-4852 of Title 50, United States Code). Violations of these export laws are subject to severe criminal penalties. Disseminate in accordance with provisions of DoD Directive 5230.25 and DoD Instruction 2040.02.

All four of these documents also contained express statements that imposed dissemination controls on the information, which restricted the dissemination of the documents to a limited universe of individuals. For example, one of the operations manuals included "Distribution Statement D," which provided that "Distribution is authorized to the Department of Defense and U.S. DoD contractors only . . . ." The banner warnings from one such document are shown in the image below.

> **DISTRIBUTION STATEMENT D** - Distribution authorized to the Department of Defense and U.S. DoD contractors only for Administrative-Operational Use, as determined on 01 March 17. Other requests for this document shall be referred to U.S. Army Tank-automotive and Armaments Command, ATTN: AMTA-LCG-FWC/TECH PUBS, MS 510, 6501 E. Eleven Mile Road, Detroit Arsenal, MI 48397-5000.
>
> **WARNING** – This document contains technical data whose export is restricted by the Arms Export Control Act (Title 22, U.S.C., Sec 2751, et. seq.) or the Export Administration Act of 1979 (Title 50, U.S.C., App. 2401 et seq.), as amended. Violations of these export laws are subject to severe criminal penalties. Disseminate in accordance with provisions of DoD Directive 5230.25.

30. On June 17, 2025, LEE provided further information about the operation manuals that he had sent, stating, "Everything relates to the M1A2 tank and the support and training behind it, as well as those documents on its operations and technical specifications."

31. Later the same day, the FBI Agent asked LEE whether he had any additional documents to provide. LEE responded, "I do apologize for my urgency, the USA is not happy

with me for trying to expose their weaknesses." LEE then added, "At this point I'd even volunteer to assist the Russian federation when I'm there in any way."

***During an In-Person Meeting with the Undercover FBI Agent, LEE Passes an SD Card Containing Closely-Held Military Documents and Boasts of Sharing Classified Information***

32. Following these discussions, LEE and the FBI Agent proceeded to discuss a potential in-person meeting. In response to a question from the FBI Agent, LEE stated that he has "about 14 ish documents explaining how U.S. army tank operators are trained." LEE then added that he also had information "about the sidekick program," which LEE described as relating to "the drone tanks to be deployed along side the next generation tanks."

33. On June 17, 2025, when asked about his location, LEE stated that he was in "El Paso TX."

34. On June 20, 2025, LEE and the FBI Agent had further discussions about LEE's requested Russian passport. LEE explained that his U.S. passport had been "confiscated." At the FBI Agent's request, LEE stated that the name on his Russian passport should be "Artyom Lee."

35. During this time, LEE and the FBI Agent continued to discuss information that LEE could provide. When told by the FBI Agent that photographs of U.S. military equipment could be "important," LEE responded that he had "photos," but that he was "working on acquiring actual hardware to hand off in person that's [of] more value."

36. On July 2 and July 7, 2025, LEE and the FBI Agent confirmed an in-person meeting for July 9, 2025. The FBI Agent stated that he had "arranged travel for experienced officer from my service to go to el paso to meet with you on evening of july 9." LEE and the FBI Agent agreed on a plan that would require two in-person meetings. With respect to the first meeting, LEE would pass information and documents. At the second meeting, LEE would bring physical hardware. As

LEE explained, the physical hardware includes "secure items and if they go missing too soon before it will raise suspicion," adding that "[a]ll of NATO uses it."

  37. On July 9, 2025, LEE met in person with a certified Undercover FBI agent ("FBI Agent 2"). This meeting was arranged via the communications between LEE and the FBI Agent. During the meeting, LEE removed his watch and removed an SD card from the Velcro portion of the watch strap. LEE handed the SD card to FBI Agent 2. The meeting was video recorded and a still of the video wherein LEE removed the SD card is produced below.



38.     During the meeting, LEE provided a detailed overview of the information contained on the SD card. LEE explained that the SD card contained four updated operations manuals for the M1A2 Abrams; several documents relating to the Bradley Fighting Vehicle, a type of armored fighting vehicle used by the U.S. military; and other manuals relating to combat operations. LEE stated that there are approximately twelve "books" on the SD card. LEE added that given his security clearance, he could acquire any documents relating to the M1A2 Abrams tank. LEE further stated that some of the information on the SD card was classified and that some of the documents had banner warnings stating that the documents should not be shared or distributed.

39.     Later in the meeting, LEE described a specific piece of hardware inside the M1A2 Abrams tank known as the Joint Battle Command-Platform ("JBC-P").[2] According to LEE, the JBC-P receives and transmits location data for U.S. military combat vehicles all over the world. According to LEE, the JBC-P system is classified at the Top-Secret level. LEE provided information as to the location of the JBC-P within the Abrams tank and stated that LEE would bring it to the next meeting with FBI Agent 2. LEE emphasized, however, that as soon as he stole the JBC-P hard drive, he would need to flee and would be unable to return to base.

40.     Over the course of the meeting, LEE described various other aspects of the M1A2 Abrams tank. LEE also stated that he had created 3D models of the tank and that the quality of the model is sufficient to allow Russian engineers to develop ways to defeat it.

***LEE Obtains JBC-P Hardware and Provides it to the Undercover FBI Agent***

---

[2] Your Affiant spoke to a U.S. Army official who is a Subject Matter Expert ("SME") on the JBC-P. The SME explained that the JBC-P is a friendly-force tracking system that runs on a satellite network and which utilizes secure data encryption. The SME explained that the JBC-P consists of several components, including a hard drive. The SME confirmed that the software code and data contained on the JBC-P hard drive are classified.

41. In the days after the meeting, LEE and the FBI Agent continued discussing the JBC-P hardware. On July 22, 2025, LEE sent several messages detailing his efforts to obtain the hardware before concluding, "But I can acquire the entire computer, screen, and transponder[.]" In a follow-up message, LEE added that "everything is a close kept secret for importance/value." As LEE explained, "The computer is what holds the hard drive, it runs the unclassified system, paired with the transponder. The hard drive holds the top secret program . . . ." On July 24, 2025, LEE reiterated that he would "acquire as much as I can without being noticed."

42. On July 28, 2025, LEE and the FBI Agent exchanged additional encrypted text messages regarding LEE's exfiltration out of the United States. For example, LEE asked whether he could pack "personal items" alongside the JBC-P hardware, which would allow LEE to "fly with only a backpack." The following day, LEE sent an image of a black, plastic footlocker.

43. On July 29, 2025, the FBI Agent asked whether LEE had a preference as to where in Russia he would live. LEE responded that, since he "would continue working for Russia in some capacity," LEE would defer to "whatever works best for Russia." The image below is a screenshot of this message.

> You can decide, Viktor was saying I would continue working for Russia in some capacity so whatever works best for Russia.    11:34 AM

44. Later that same day, in an apparent reference to his outreach in May 2025 to the Russian government, LEE wrote "Can I ask what embassy responded? I tried contacting several times via different methods." LEE then asked whether he needed "to destroy items such as birth certificate, identity cards?" In a subsequent message about the same topic, LEE explained that "I contacted the Russian embassy in DC, and your two consulates for a couple months . . . ." The image below is a screenshot of some of these messages.

> Yes sir. Can I ask what embassy responded? I tried contacting several times via different methods. Which ways work best for Russia for my type of circumstance? If I may ask
>
> And for clarification do I need to destroy items such as birth certificate, identity cards?
>
> 11:40 AM

45. On July 30, 2025, LEE sent the following message: "Great news for you today, two tanks were damaged and recovered from the field and I have everything needed you requested." LEE then clarified, "Yes everything is acquired. Including hard drive. Just lucky that I got it sooner." LEE added, "And no one knows I have them. They think they got lost out in desert." Finally, LEE sent a message in Russian explaining why and how he had acquired the JBC-P hardware earlier than expected.

46. On July 31, 2025, after further messages between LEE and the FBI Agent, LEE delivered what appeared to be JBC-P hardware to a storage unit in El Paso, Texas. Unbeknownst to LEE, the storage unit was under the control of the FBI. LEE delivered the apparent JBC-P hardware inside in a black, plastic footlocker that matched the photograph LEE had sent on July 29, 2025. A preliminary search of the footlocker revealed that the hardware inside was labeled with a sticker that read, "SECRET"—an indicator that at least some of the footlocker's contents were likely classified. After delivering the hardware to the storage unit, LEE sent a message to the FBI Agent stating, "Mission accomplished."

### *DDTC Confirms M1A2 Operations Manuals are Export Controlled and that LEE Failed to Obtain a License*

47.     On July 23, 2025, the Department of State's Directorate of Defense and Trade Controls ("DDTC") completed a license determination on the four operations manuals transmitted by LEE using the encrypted messaging application. The review confirmed that, at all times material to this investigation, these four operation manuals "were and are technical data subject to the jurisdiction of the Department of State in accordance with the International Traffic in Arms Regulations (ITAR) (22 CFR parts 230-130)." Consequently, the DDTC concluded, "[p]ursuant to the ITAR, a license or other approval was and is required prior to any export from, or temporary import into, the United States."

48.     Separately, the DDTC also performed a registration and license history check. That search concluded that LEE has never applied for nor been granted a license to export the aforementioned operations manuals.

49.     All of these operations manuals were provided by LEE to the undercover FBI Agent, who LEE believed was an official of Russia's Ministry of Defense. The DDTC concluded that these operations manuals are subject to the ITAR, and, therefore, that a license was and is required to export these items to a foreign national, including an official from Russia's Ministry of Defense. LEE never obtained such a license before knowingly attempting to transmit the Operations Manuals to a foreign government official.

### *The SD Card Passed by LEE Contains Documents that are Subject to Safe Handling and Dissemination Controls*

50.     The SD card passed by LEE to an individual he believed to be a representative of the Russian government contained at least seven documents that were marked as containing Controlled Unclassified Information ("CUI") and/or Controlled Technical Information ("CTI"). These documents were dated between February 2022 and November 2024. All seven documents

related to military training, tactics, techniques, procedures, and/or equipment. Several of the documents also featured dissemination warnings on their cover pages. One such warning stated: "**DISTRIBUTION RESTRICTION**: Distribution authorized to U.S. Government agencies and their contractors only to protect technical or operational information from automatic dissemination under the International Exchange Program (AR 614-10) or by other means." By attempting to transmit these documents to the Russian government, LEE knowingly sought to violate these dissemination controls.

51. CUI is defined as "information the Government creates or possesses . . . that a law, regulation, or Government-wide policy requires or permits an agency to handle using safeguarding or dissemination controls." 32 C.F.R. § 2002.4(h). By regulation and Department of Defense policy, such information is subject to dissemination controls, safe handling and marking requirements, and may only be stored on certain computer systems and networks. 32 C.F.R. § 2002.14; *see also* Department of Defense Instruction 5200.48 at §§ 3, 4. Additionally, Department of Defense personnel are required to receive training on the proper handling of CUI.

52. On or about March 22, 2024, as a requirement of his position with the U.S. Army, LEE completed a cyber awareness training course. Based on internal U.S. Army documents, this training "reinforces best practices to protect classified, controlled unclassified information (CUI), and personally identifiable information (PII)." Included in the training are slides explaining that "Controlled Unclassified Information (CUI) is Government information that must be handled using safeguarding or dissemination controls." Additionally, the training explains that U.S. Army servicemembers, like LEE, must "[s]tore CUI data only on authorized information systems" and that servicemembers must "[h]andle, and store CUI properly." The training also cites specific Department of Defense policies that further set forth the proper handling of CUI.

## CONCLUSION

53.    In summary, based upon the above facts and information, I submit that there is probable cause to believe that TAYLOR ADAM LEE has violated the Armed Exports Control Act, Title 22, U.S. Code, Section 2778(b) and the Espionage Act, Title 18, U.S. Code, Section 794(a).

Respectfully submitted,

_____
Nicholas A. Napoli
Special Agent
Federal Bureau of Investigation

**Submitted, attested to, and acknowledged by reliable electronic means this 8th day of August, 2025.**

_____
LAURA ENRIQUEZ
UNITED STATES MAGISTRATE JUDGE

**Affidavit reviewed and submitted by Assistant United States Attorney Nathan Brown and National Security Division Trial Attorney Menno Goedman.**